UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

MOBIL CERRO NEGRO LTD., et al.,

                Arbitration Award Creditors,

              -v-

BOLIVARIAN REPUBLIC OF VENEZUELA,

              Arbitration Award Debtor.

------------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/13/2015

14 Civ. 8163 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    At issue in this case is the process by which an arbitral award issued by the International
Centre for Settlement of Investment Disputes ("ICSID") is to be recognized and converted into a
federal court judgment. ICSID is a unique arbitral tribunal. Created pursuant to an international
treaty, the Convention on the Settlement of Investment Disputes between States and Nationals of
Other States ("the ICSID Convention"), ICSID addresses disputes involving international
investments in which one party is a foreign sovereign. The United States has been a treaty
member since 1966, when the ICSID Convention entered into force and Congress passed
enabling legislation.

    Conversion of an arbitral award into a judgment allows a creditor to begin to enforce the
award, for instance, by attaching or executing on assets. And the enabling statute for the ICSID
Convention, 22 U.S.C. § 1650a, contemplates that federal courts will recognize ICSID awards
and enforce them. However, § 1650a does not specify the process by which a creditor is to
convert its ICSID award into a federal court judgment. Must the creditor bring a plenary action,

subject to the ordinary requirements of service of process, personal jurisdiction over the award debtor, and venue?  Or may a more streamlined process be used?

The ICSID award creditors in this case take the position, supported by case law and practice in this District, that to fill this gap in § 1650a, a district court may look to the forum state's law.  New York law permits recognition of a foreign judgment on an *ex parte* basis, so long as the judgment debtor is notified within 30 days.  (The creditor must then wait another 30 days before attaching or executing on assets.)  The award creditors here—ExxonMobil entities ("Mobil")—proceeded on that basis:  A day after ICSID issued a $1.6 billion award in their favor against the Bolivian Republic of Venezuela ("Venezuela"), Mobil brought an *ex parte* petition in this District to recognize that award.  The Court's miscellaneous part (Part One) granted that petition, and a final judgment ("the Part One judgment") was entered.  Mobil notified Venezuela of the judgment soon thereafter.

Venezuela, the award debtor, now moves to vacate the Part One judgment.  It makes two arguments.  First is that the enabling statute, § 1650a, does not permit *ex parte* recognition proceedings—it is instead necessary to bring a plenary lawsuit.  Second is that recognition of an ICSID award against a foreign sovereign is governed by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, which requires that any action against a foreign sovereign be brought with service of process upon, and personal jurisdiction over, the sovereign, and in a designated venue.  Venezuela therefore argues that the Part One judgment is void for want of subject matter and personal jurisdiction and because this District is an improper venue.

For the reasons that follow, the Court denies Venezuela's motion to vacate the Part One judgment.  However, because Venezuela (after this action was filed) applied to ICSID to revise the amount of the arbitral award and because ICSID has stayed enforcement of that award

pending resolution of Venezuela's application, the Court stays enforcement of the Part One judgment for the time being.

## I.      Background[1]

### A.      The Parties

The arbitration award creditors are a series of ExxonMobil entities that, in the 1990s, began investing in the oil industry in Venezuela.[2]  *See* Dkt. 3 ("Award"), Ex. 1 ¶¶ 45–52.  The Court refers to these entities collectively as "Mobil."

The arbitration award debtor is Venezuela, a leading petroleum-producing country. Award ¶ 35.  In 2007, Venezuela expropriated Mobil's interests in certain oil projects in Venezuela.  *Id.* at ¶ 112.

### B.      The Arbitral Award

In 2007, Mobil commenced an arbitration against Venezuela, challenging the expropriation.  Mobil did so pursuant to a bilateral investment treaty under which Venezuela waived its sovereign immunity with respect to Mobil's claims.  Mobil Br. 1.

The arbitration was conducted under the auspices of ICSID, a part of the World Bank. Mobil and Venezuela actively participated in the arbitration and were represented by counsel. *See* Award, p. 2.

---

[1] This background is drawn from the parties' submissions, including Mobil's *ex parte* petition to recognize the arbitration award, its memorandum of law in support of that petition, and its accompanying declaration, *see* Dkt. 1–3; Venezuela's motion to vacate the judgment, its memorandum of law in support of that motion, and an accompanying declaration, *see* Dkt. 12–14; Mobil's memorandum of law in opposition and accompanying declaration, *see* Dkt. 25–26; and Venezuela's reply memorandum of law and accompanying declaration, *see* Dkt. 28–29.

[2] These are Mobil Cerro Negro, Ltd.; Venezuela Holdings, B.V.; Mobil Cerro Negro Holding, Ltd.; Mobil Venezolana de Petróleos Holdings, Inc.; and Mobil Venezolana de Petróleos, Inc. *See* Dkt. 25 ("Mobil Br."), at 1, n.1.

On October 9, 2014, the ICSID panel issued a 134-page decision ("the Award") that awarded Mobil $1,600,042,482, plus 3.25% interest, compounded annually from June 27, 2007 until payment. *Id.* ¶ 404. To date, Venezuela has not paid on the Award. Mobil Br. 2.

## C.    Procedural History

The next day—October 10, 2014—Mobil filed an *ex parte* petition in this District seeking recognition of the Award and entry of judgment. Dkt. 1. The Hon. J. Paul Oetken, sitting in Part One, held an *ex parte* hearing, *see* Dkt. 21, granted the petition, and entered a final judgment in the amount of $1,600,042,482, plus 3.25% interest, compounded annually from June 27, 2007 until payment, *see* Dkt. 6. The same day, Mobil sent a letter to Venezuela's counsel, notifying them of the judgment and demanding payment. Dkt. 26, Ex. 1.

On October 14, 2014, Venezuela moved to vacate the judgment. It filed an accompanying memorandum of law and declaration. *See* Dkt. 12–14. On October 23, 2014, this matter was assigned to this judge. *See* Dkt. 23. On November 10, 2014, Mobil filed an opposing brief and a declaration. *See* Dkt. 25–26. On November 24, 2014, Venezuela submitted a reply brief and a declaration. *See* Dkt. 28–29. On December 12, 2014, the Court held argument.

Separately, on October 23, 2014, while Venezuela's motion to vacate was pending, Venezuela filed an application with the ICSID panel to revise the Award. *See* Dkt. 28 ("Pizzurro Reply Decl."), Ex. A. There, Venezuela did not contest that Mobil is owed $1,600,042,482, plus interest. Instead, it argued that Mobil's Award in that amount partly duplicates a recovery Mobil previously received from another source—Venezuela's state-owned oil company. *See* Award ¶¶ 375–77. On October 24, 2014, the ICSID Secretary-General registered Venezuela's application for revision and stayed enforcement of the Award. Pizzurro Reply Decl., Ex. A.

## II.      Legal Standards

Venezuela moves, under Federal Rule of Civil Procedure 60(b), to vacate the Part One judgment.

Rule 60(b) permits a court to "relieve a party . . . from a final judgment" for a variety of reasons, including, relevant here, that "the judgment is void" or for "any other reason that justifies relief."[3]  *See Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986).  "A judgment is void under Rule 60(b)(4) . . . 'only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.'"  *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 193 (2d Cir. 2006) (quoting *Texlon Corp. v. Mfrs. Hanover Commercial Corp.*, 596 F.2d 1092, 1099 (2d Cir. 1979)); *see also "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123 (2d Cir. 2008) (holding that Rule 60(b)(4) was properly invoked to challenge lack of personal jurisdiction) (citing 11 Charles A. Wright, Arthur

---

[3] In its entirety, Rule 60(b) states:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

R. Miller, & Mary Kay Kane, Fed. Prac. & Pro. § 2862, at 326–27 & n.10 (2d ed. 1995 & Supp. 2008)); *see generally United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010).[4]

"A motion under Rule 60(b) must be made within a reasonable time."  Fed. R. Civ. P. 60(c).  Venezuela's motion—made four days after the Part One judgment—was timely.  *See Cent. Vermont Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 189 (2d Cir. 2003).

## III.   Overview of Venezuela's Challenges to the Part One Judgment

Venezuela does not argue that there is any substantive defect in the Part One judgment. Instead, in moving to vacate, Venezuela makes two procedural arguments against that judgment. The first is that 22 U.S.C. § 1650a, the enabling statute, does not authorize borrowing New York State's streamlined *ex parte* recognition procedure, as occurred here.  Dkt. 14 ("Venezuela Br."), 7–16.  The second is that even if the enabling statute initially authorized that procedure, the FSIA, enacted 10 years later, supersedes it where recognition actions are brought against foreign sovereigns, and imposes service-of-process, personal jurisdiction, and venue requirements not met here.  *Id.* at 6–7, 16–17.  Venezuela argues that under either § 1650a or the FSIA, a plenary lawsuit is required to recognize an ICSID award against a foreign sovereign.  *Id.* at 2, 14, 17.

The Court addresses these arguments in turn.

## IV.   Venezuela's Argument Based on § 1650a

### A.   Background on the ICSID Convention and the Enabling Statute

The ICSID Convention is an international treaty drafted in 1965 which entered into force in 1966.  *See* 17 U.S.T. 1270, T.I.A.S. No. 6090.  The treaty's purpose was to stimulate economic development by private parties.  *See* ICSID Convention pmbl.  To further that goal, the

---

[4] Mobil does not dispute that Rule 60(b) is a proper procedural vehicle under which Venezuela may challenge the Part One judgment.

Convention supplies a neutral forum, an international arbitral institution known as ICSID, to resolve disputes between a private party of one country and the government of another.  *See id.* art. 1.

ICSID has jurisdiction over a dispute where two requirements are met.  First, there must be an investment-related legal dispute between a state party to the Convention and a national of another state that is also a party to the treaty.  Second, the parties to the dispute must consent to ICSID's jurisdiction.[5]

Where ICSID has jurisdiction, its determinations are final.  ICSID awards are binding and subject to review only within ICSID itself.  *See* ICSID Convention art. 53 (ICSID awards "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention").  National courts thus lack the power to set aside or modify ICSID awards.  They may review such awards solely to confirm their authenticity. *See* Dolzer & Schreuer, *Principles of Int'l Inv. Law* 224; Christoph G. Schreuer, *The ICSID Convention: A Commentary* 1126 (2d ed., 2009).

---

[5] *See* ICSID Convention art. 25 ("The jurisdiction of [ICSID] shall extend to any legal dispute arising directly out of an investment, between a Contracting State . . . and a national of another Contracting State, which the parties to the dispute consent in writing to submit to" ICSID); *accord id.* pmbl. ("mutual consent by the parties to submit such disputes to" ICSID "constitutes a binding agreement which requires in particular that . . . any arbitral award be complied with"); *see generally* Rudolf Dolzer & Christoph Schreuer, *Principles of Int'l Inv. Law* 223 (2008).

In this respect, ICSID awards are more secure from attack than awards from other arbitral institutions.[6]  Other arbitral awards, whether governed by a statute or an international treaty, are subject to substantive review, albeit limited.[7]

ICSID awards, however, can and are expected to be *recognized* and *enforced* in national courts.  Article 54(1) of the ICSID Convention, addressing recognition, provides:  "Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.  A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state."

Article 55 of the ICSID Convention, addressing execution on assets, provides:  "Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State

---

[6] *See* New York City Bar, *Report by the Comm. on Int'l Commercial Disputes: Recommended Procedures for Recognition & Enforcement of Int'l Arbitration Awards Rendered Under the ICSID Convention* 2–3 (July 2012) ("Committee Report") ("ICSID arbitral awards are different from every other kind of arbitral award because they are not subject to judicial review.  The ICSID system provides for a self-contained dispute resolution process that is intended to foreclose the review by any court of final arbitral awards."), *available at* http://www2.nycbar. org/Publications/reports/index_new.php?type=subject&alpha=I (last visited February 12, 2015).

[7] Domestic arbitral awards are governed by Chapter 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*  These awards are subject to challenge on various grounds, including that the award was procured by corruption, fraud, or undue influence; that the arbitrators exceeded their powers or committed misconduct in refusing to hear material evidence; or that they made a clear miscalculation.  *See id.* §§ 10–11; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) (leaving open question whether an arbitrator's "manifest disregard" of the law supplies an independent basis for *vacatur* of an award).  Many international arbitration awards are governed by Chapter 2 of the FAA, 9 U.S.C. § 201 *et seq.*, which codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38.  The grounds on which an award issued pursuant to the New York Convention can be attacked are reviewed *infra*, at pp. 35–37.

relating to immunity of that State or of any foreign State from execution."  Considered together, Articles 54 and 55 provide that, for contracting states, recognition of ICSID awards is compulsory, whereas the later execution of assets to satisfy such an award is subject to contracting states' domestic laws, which may vary.  *See* Schreuer, *The ICSID Convention* 1143.

The United States has been a contracting state since 1966.  *See* 17 U.S.T. 1270, T.I.A.S. No. 6090.[8]  The enabling statute passed by Congress and signed by President Lyndon B. Johnson provides in full:

> (a) **Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act**
> An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.  The Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) shall not apply to enforcement of awards rendered pursuant to the convention.
>
> (b) **Jurisdiction; amount in controversy**
> The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy.

22 U.S.C. § 1650a.

---

[8] Venezuela was also a contracting state, between 1993 and 2012.  Venezuela's withdrawal from ICSID in 2012 did not prevent ICSID from hearing and resolving this case, because Venezuela's membership and 2007 consent to ICSID jurisdiction gave it a continuing obligation to abide by ICSID's award.  *See* ICSID Convention art. 72 ("Notice by a Contracting State [that it intends to withdraw from ICSID] pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary.").

The brief text of the enabling statute thus does not specify the procedural mechanism by which an arbitral award is to be converted into a federal judgment.[9]

### B.     Prior *Ex Parte* ICSID Recognition Actions in This District

On five occasions before this case, courts in this District have been presented with an application *ex parte* to recognize an ICSID award.  In four, the foreign sovereign was the award debtor.[10]  Each time, the district court recognized the ICSID award (*i.e.*, converted it to a federal court judgment) without requiring that a plenary lawsuit be brought.

1.     *LETCO*:  In *Liberian Eastern Timber Corporation (LETCO) v. Republic of Liberia*, No. M-68, 1986 U.S. Dist. LEXIS 31062 (S.D.N.Y. Sept. 10, 1986), the award creditor (LETCO) obtained an ICSID award against the Republic of Liberia.  It then petitioned *ex parte* for entry of judgment and for the issuance of writs of execution permitting LETCO to begin enforcing that judgment.  The Part One judge (Keenan, J.) granted LETCO's petition in both respects.  *Id.* at *1–2.

Notified of the Part One judgment, Liberia then moved to vacate it, and "to enjoin the issuance of executions to seize its property or assets in order to satisfy the judgment."  *Liberian*

---

[9] *See* Edward G. Kehoe, "The Enforcement of Arbitral Awards against Foreign Sovereigns—the United States," in *Enforcement of Arbitral Awards against Sovereigns* 250 (R. Doak Bishop ed., 2009) ("[Section] 1650a does not specify the procedural mechanism, whether be it in the form of registration, a motion, complaint or otherwise, by which a party converts an ICSID award into an enforceable U.S. federal court judgment.") (provided in Dkt. 26, Ex. 7).

[10] In four other cases, applications were made to recognize ICSID awards with notice to the sovereign.  *See Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Republic of Peru*, 904 F. Supp. 2d 131 (D.D.C. 2012); *Blue Ridge Invs., LLC v. Republic of Argentina*, 902 F. Supp. 2d 367, 370 (S.D.N.Y. 2012) *aff'd*, 735 F.3d 72 (2d Cir. 2013); *Cont'l Cas. Co. v. Argentine Republic*, 893 F. Supp. 2d 747 (E.D. Va. 2012); *Funnekotter v. Republic of Zimbabwe*, No. 09 Civ. 8168 (CM) (Dkt. 11) (S.D.N.Y. Feb. 1, 2010).  The Court is unaware of other decisions as to the process for recognition of ICSID awards.

*E. Timber Corp. (LETCO) v. Republic of Liberia*, 650 F. Supp. 73, 75 (S.D.N.Y. Dec. 12, 1986).

The district court (Weinfeld, J.) denied the motion to vacate.  *Id.* at 76–77.  It reasoned that

(1) Article 54 of the ICSID Convention obliges the United States, as a contracting party, "to

recognize and enforce the pecuniary obligation of the award"; (2) Liberia, as a Convention

signatory, waived its sovereign immunity with respect to recognition "of any arbitration award

entered pursuant to the Convention"; and (3) "Liberia clearly contemplated the involvement of

the courts of any of the Contracting States, including the United States as a signatory to the

Convention, in enforcing the pecuniary obligations of the award."  *Id.* at 76.  The decision did

not address the fact that LETCO's petition for entry of judgment had been brought *ex parte*.[11]

2.     *Three cases decided without opinion*:  In the ensuing years, *ex parte* judgments

recognizing ICSID arbitral awards were entered, without a written decision, in three other cases

in this District.  *See Grenada v. Grynberg*, No. 11 Misc. 45 (S.D.N.Y. Apr. 29, 2011) (Batts, J.);

*Enron Corp. & Ponderosa Assets L.P. v. Argentine Republic*, No. M-82 (S.D.N.Y. Nov. 20,

2007) (Buchwald, J.); *Sempra Energy Int'l v. Argentine Republic*, No. M-82 (S.D.N.Y. Nov. 14,

2007) (Buchwald, J.) (all provided in Dkt. 26, Ex. 3).  The propriety of an *ex parte* recognition

proceeding does not appear to have been raised in these matters; indeed, it appears that the award

debtor did not object to the entry of any of these judgments.

3.     *Siag*:  The most sustained attention to the proper recognition procedure for ICSID

awards prior to this case came in *Siag v. Arab Republic of Egypt*, No. M-82 (PKC), 2009 WL

---

[11] The Court, however, vacated the executions issued against Liberia's property, on the ground
that the particular property at issue had not been used for "commercial activities," and therefore
was immune from attachment under the FSIA. *Id.* at 77–78 (citing 28 U.S.C. § 1610(a)).
LETCO appealed, and the Second Circuit affirmed without opinion. *See Liberian E. Timber
Corp. (LETCO) v. Republic of Liberia*, 854 F.2d 1314 (2d Cir. 1987).

1834562 (June 19, 2009).  Acting *ex parte*, the ICSID award creditors submitted to Judge Castel,

sitting in Part One, a proposed judgment incorporating the pecuniary obligations of the ICSID

award.  Judge Castel directed the award creditors to brief whether the sovereign was entitled to

advance notice and an opportunity to be heard.  *See id.* at *1.

> After briefing, Judge Castel entered judgment for the creditors, upholding as proper their

*ex parte* application.  He reasoned:

> Article 54 subsection 1 of the ICSID provides that "[a] Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of a court of a constituent state."  Congress has determined that in enforcing an ICSID award, a federal court is to treat it as it would a final judgment from a state court:  "The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several states."  22 U.S.C. § 1650a(a). . . .

> In treating an ICSID arbitration award as I would the final judgment of a state court, the procedures of New York's CPLR are relevant.  In *Keeton v. Hustler Magazine, Inc.*, 815 F.2d 857 (2d Cir. 1987), the Second Circuit held that Article 54 of the CPLR sets forth appropriate procedures for registering an out-of-state federal court judgment in the State of New York, and further held that it can function as a viable alternative to 28 U.S.C. § 1963, the federal statute that governs registration and enforcement of an out-of-state federal court judgment.  *Keeton* noted that Article 54 of the CPLR establishes "procedures designed to facilitate the registration of foreign, or out-of-state, judgments, for New York will, with specified exceptions, simply recognize a foreign judgment as its own, rather than require a separate action on the judgment."  815 F.2d at 857.  "Article 54 of the CPLR sets up a procedure for the simple New York registration of an out-of-state judgment, obviating an action on the judgment . . . ."  David D. Siegel, *N.Y. Practice* § 435 (4th ed.).  By its terms, CPLR § 5401 applies to "any judgment . . . of a court of the United States or any other court which is entitled to full faith and credit in this state . . . ."

> In *Keeton*, the judgment debtor removed the Article 54 proceedings to federal court, where its requests to set aside the judgment and stay the judgment's execution were denied.  815 F.2d at 858.  Among other things, *Keeton* observed that the plain text and the legislative history of Article 54 reflect an intention that the CPLR provision should provide a vehicle through which the judgment of a "sister state" could be enforced in New York.  *Id.* at 859–61 (citing *Knapp v. McFarland*, 462 F.2d 935 (2d Cir. 1972)).  It concluded that the federal scheme

for registration of an out-of-state federal court judgment, 28 U.S.C. § 1963, did
not preempt the application of CPLR Article 54.  *Id.* at 861–62.

*Siag*, 2009 WL 1834562, at *1–2.

Accordingly, Judge Castel held, it was appropriate for a federal court in New York to
"adopt the procedures of Article 54 of the CPLR to effectuate the entry of judgment for an award
rendered under the ICSID Convention."  *Id.* at *3.  He directed the award creditors to provide
notice of the judgment he entered to the sovereign, the U.S. Department of State, and the U.S.
Attorney's Office for this District.  *Id.*[12]  In so acting, Judge Castel recognized that, while an
ICSID award creditor may seek recognition *ex parte*, it may alternatively elect to file a plenary
action, *see id.* at *2 n.1, as some creditors have, *see, e.g.*, *Blue Ridge Invs.*, 902 F. Supp. 2d at
370.

*Siag* thus identified CPLR Article 54 as a mechanism available for converting ICSID
awards into judgments in this District.  Article 54 "sets up an expeditious registration procedure"
for New York to register an out-of-state judgment that is entitled to full faith and credit.  David
D. Siegel, *Practice Commentaries* C5403:2 at 581–82 (McKinney's 1997).  A judgment creditor
who uses this procedure must, within 30 days of entry of judgment, notify the judgment debtor;
after filing proof of service, the judgment creditor must wait 30 more days before executing on
the judgment.  *See* CPLR § 5403.  The CPLR does not require that the "recognizing" court have
personal jurisdiction over the award debtor.  *See* Siegel, *N.Y. Practice* § 435.

---

[12] In this case, Judge Oetken similarly ordered Mobil to notify these three entities.  *See* Dkt. 6,
21.  Mobil has done so.  *See* Dkt. 20 (Notice of Service, filed Oct. 16, 2014).

### C.      Analysis of Venezuela's Arguments

Venezuela's argument here under § 1650a is that *Siag*—and the other cases reviewed above—were wrongly decided, and that the enabling statute does not permit a federal court in New York to use non-plenary mechanisms such as CPLR Article 54 to convert an ICSID award into a judgment.  Venezuela, however, is mistaken.  As explained below, the case law overwhelmingly supports looking to the law of the forum state, here, New York, to fill the procedural gap in § 1650a as to the manner in which a recognition proceeding is to occur.  And Venezuela's contrary arguments, largely ones of policy, are not persuasive.

 It is undisputed that there is a statutory gap.  The ICSID Convention directed contracting states to recognize and enforce the pecuniary obligations of ICSID awards once the creditor had furnished a national court with a certified copy of its award.  ICSID Convention art. 54(1).  And the enabling statute—although addressing enforcement of an award—is silent as to the antecedent process by which the award is converted into an enforceable U.S. federal court judgment.

There is compelling authority supporting filling this statutory gap by looking, as Judge Castel did in *Siag*, to the law of the forum state.  The Rules of Decision Act states that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."  28 U.S.C. § 1652.  Federal Rule of Civil Procedure 69(a)(1) provides, *inter alia*, that the procedure for executing a judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  And more generally, the Second Circuit has held it proper to apply the forum state's law when a court confronts such a gap in a federal statutory scheme, reflecting the

general rule that a federal court "has discretion to borrow from state law when there are deficiencies in the federal statutory scheme." *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).[13]

Applying these principles, the Second Circuit has repeatedly held that federal courts are to borrow state law to fill gaps in a federal statutory scheme, including in cases whose subject matter presents a quintessentially federal concern.  Three examples illustrate the point.

In the area of copyright, the Copyright Act, 17 U.S.C. § 101 *et seq.*, does not provide for nationwide service of process.  Accordingly, the Second Circuit has held, "'a federal court [is to] appl[y] the forum state's personal jurisdiction rules." *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)).  The Circuit therefore held that New York's long-arm statute was to be used to determine whether personal jurisdiction existed for a suit brought under the Act.  *See id.* at 196–97.

In the area of bankruptcy, the Second Circuit has similarly held that a federal court is to apply the forum state's choice-of-law rules because the federal interests at stake are not weighty enough to justify creating federal common law.  *See In re Gaston & Snow*, 243 F.3d 599, 605–06 (2d Cir. 2001).  It has explained that the "cases in which judicial creation of a special federal rule would be justified . . . are . . . few and restricted," *id.* at 606 (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994)), and that "a significant conflict between some federal policy or interest and the use of state law must first be specifically shown" to justify creating federal

---

[13] As a general matter, "[s]tate law is applied by federal courts in three situations: (1) when they are so required by *Erie v. Tompkins*, 304 U.S. 64 (1938), (2) when they are so directed by a federal statute, or (3) as a matter of discretion in their exercise of power to so choose." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 643 F. Supp. 1217, 1221 (D.N.J. 1986), *aff'd in part, modified in part*, 834 F.2d 326 (3d Cir. 1987) (citing 19 Wright, Miller & Cooper, Jurisdiction § 4515 (1976)).  The third of those scenarios is at issue here.

common law as opposed to applying the forum state's law to fill the statutory gap, *id.* (quoting *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)).

Additionally, the Second Circuit has held that the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, leaves it to the forum state's law to address the length of a wind-up period, where a state seeks to recover environmental cleanup costs from a dissolved corporation. Accordingly, it has applied the law of the forum state, Delaware, which barred the claims of the plaintiff state (New York). *See Marsh v. Rosenbloom*, 499 F.3d 165, 181–84 (2d Cir. 2007). The Second Circuit explained that, "where federal statutory regulation is 'comprehensive and detailed,' as CERCLA is, we presume that matters left unaddressed are 'left subject to the disposition provided by state law.'" *Id.* at 181 (quoting *O'Melveny*, 512 U.S. at 85). "Although CERCLA is a federal statute for which there is presumably an interest in uniform application, where there is no conflict between federal policy and the application of state law, 'a mere federal interest in uniformity is insufficient to justify displacing state law in favor of a federal common law rule.'" *Id.* at 182 (quoting *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 208 (2d Cir. 2006)).

Applying these principles here, it is appropriate to look to the forum state's law to fill the statutory gap—to supply the procedure for recognizing an ICSID award and converting into a judgment. It is no answer that the ICSID Convention involves an area of peculiarly federal concern: The same is true of copyright, bankruptcy, and CERCLA. And the Second Circuit has looked to the forum state's law to fill gaps in cases like this, where the federal interest involved foreign relations, including cases arising under international treaties and under the FSIA. *See, e.g.*, *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12–13 (2d Cir. 1996) (applying forum state's choice of law rules in case arising under Warsaw Convention); *Brink's Ltd. v. S. African*

*Airways*, 93 F.3d 1022, 1029–30 (2d Cir. 1996) (applying forum state's choice of law rules where jurisdiction was predicated on FSIA and liability governed by Warsaw Convention); *Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 961 (2d Cir. 1991) (applying New York choice of law principles in FSIA action; "the fact that we are not compelled to apply state choice of law principles in this federal question case does not preclude us from relying on state law if we believe that doing so would best effectuate Congress' overall intent") (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979)).

The decisive issue instead is whether there is "a significant conflict between some federal policy or interest and the use of state law." *Gaston & Snow*, 243 F.3d at 606 (quoting *Atherton*, 519 U.S. at 218). Venezuela identifies no such federal interest. On the contrary, using the streamlined recognition procedure in CPLR Article 54 *effectuates* the policy interests underlying the ICSID enabling statute, because, by facilitating conversion of an ICSID award to a judgment, it facilitates granting "full faith and credit" to the award and enables the creditor to move towards enforcing it. As Judge Castel noted, § 1650a's directive that ICSID awards be given "full faith and credit" reflects that Congress, like the ICSID Convention that it was implementing, intended that ICSID awards be expeditiously recognized, free from substantive review. *See Siag*, 2009 WL 1834562, at *1–3 (citing *Keeton*, 815 F.2d at 857; CPLR art. 54).

In considering whether borrowing state law is consistent with congressional intent, it is, further, noteworthy that the state-law recognition procedure in CPLR Article 54 was a familiar one in 1966, when Congress passed the ICSID enabling statute. Article 54 is based on the Uniform Enforcement of Foreign Judgments Act (UEFJA), a draft statute proposed in 1948, and revised in 1964, by the National Conference of Commissioners on Uniform State Laws. In a preface to the 1964 UEFJA, the Commissioners endorsed a "speedy and economical method" of

registering judgments that are entitled to full faith and credit, explaining that due process does not require a second trial following a state-court judgment and that this method spares parties the cost and time of repeat litigation. *Prefatory Note*, Revised Uniform Enforcement of Foreign Judgments Act (1964). The revised UEFJA permits a creditor to file a copy of his judgment with the Clerk of Court in another state and, after notifying the judgment debtor, to begin executing his judgment. *Id.* § 2. By 1965, several states had enacted recognition procedures based on the revised UEFJA[14]; to date, 47 states have done so.[15] Thus, when Congress enacted § 1650a, with its gap as to the process for recognizing ICSID awards, it was on notice that expeditious, *ex parte* recognition procedures were being used in both state and federal courts. *See also* 28 U.S.C. § 1963 (1948) (statute governing expeditious registration of federal judgments).

In opposing the borrowing of CPLR Article 54, Venezuela argues that borrowing forum states' laws would offend an interest in uniformity. But, as case law in the area of borrowing of state law holds, where there is no demonstrated need for uniformity across federal-court proceedings, a party's articulation of a generalized interest in uniformity will not prevail. *See, e.g.*, *Rosenbloom*, 499 F.3d at 181–83. And Venezuela's claim that uniformity is vital is

---

[14] *See, e.g.*, Wyo. Stat. Ann. § 1-17-701 *et seq.* (Feb. 11, 1965); 42 Pa. Cons. Stat. § 4306 (May 21, 1965); Wisc. Stat. Ann. § 806.24 (Nov. 24, 1965).

[15] *See* Uniform Law Commission, The National Conference of Commissioners on Uniform State Laws, *Legislative Fact Sheet—Enforcement of Foreign Judgments Act* (noting that all states but California, Vermont, and Connecticut have enacted a version of the UEFJA), *available at* http://www.uniformlaws.org/LegislativeFactSheet.aspx?title=Enforcement%20of%20Foreign%2 0Judgments%20Act (last visited February 12, 2015).

particularly dubious in the ICSID context:  By definition, ICSID awards are subject to unique

enforcement regimes in each of the more than 140 member states.[16]

Venezuela also argues that borrowing expedited registration procedures such as New

York State's may offend foreign comity.  That is unpersuasive.  Under the ICSID Convention,

the ICSID recognition process is entirely non-substantive.  Beyond confirming that the ostensible

award did in fact issue from ICSID, a court presented with an application for recognition is not

empowered to re-assess the merits of the award—it does not sit as a court of appeals and is not

empowered to undertake substantive review.  The only venue in which a party can challenge the

merits of such an award is ICSID itself.  *See* ICSID Convention art. 53 ("The award shall be

binding on the parties and shall not be subject to any appeal or to any other remedy except those

provided for in this Convention.").  Symbolism aside, a foreign party has no valid ground to

claim offense at a streamlined recognition procedure.  And, as more fully demonstrated below,

an expectation underlying the ICSID Convention was that awards would be expeditiously

recognized in contracting states.  *See infra*, pp. 38–39.

It is, further, important to recognize that conversion of an award into a judgment leaves

the foreign sovereign free to challenge the later attachment of or attempted execution on its

assets.  Because Venezuela is a foreign state, under the FSIA, Mobil can attach or execute on its

assets only after obtaining a court order permitting it to do so.  *See* 28 U.S.C. § 1610(c); *see also*

*infra*, pp. 46–47; *accord* Tr. 28.  In any event, under New York CPLR § 5403, there must be

---

[16] *See* ICSID Convention art. 54(3) ("Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought."); ICSID, *Database of ICSID Member States*, *available at* https://icsid.worldbank.org/apps/ICSIDWEB/about/Pages/Database-of-Member-States.aspx?tab=AtoE&rdo=CSO (last visited February 12, 2015).

both prompt notice to the debtor and a waiting period of 30 days, after notice is given of a recognized judgment, before a creditor can seek to attach or execute on assets.

In sum, whether Mobil applied for recognition of its award via a plenary lawsuit or an *ex parte* application along the lines used here, the nature of that proceeding would not expand or contract Venezuela's substantive rights.  Those rights—to challenge the award substantively before ICSID and to resist attachment or execution in the United States to the extent assets are found here—are unaffected by the recognition process.[17]

In a final argument, Venezuela argues that, rather than borrowing from the forum state's law, a federal court asked to recognize an ICSID award should use the procedure used on the rare occasions when an application is made to register a state-court judgment as a federal judgment. Such a court undertakes a two-step inquiry: "(1) whether, under federal law, the judgment is entitled to full faith and credit; and (2) what preclusive effect would the judgment be given under the law of the rendering state."  *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 90 n.7 (2d Cir. 2000).

---

[17] The commentators to address the point agree that recognition of an ICSID award is a non-substantive proceeding that may be performed summarily where the forum state's recognition procedure so provides.  *See, e.g.*, Brian King et al., "Enforcing Awards Involving Foreign Sovereigns," in *Int'l Commercial Arbitration in New York* 421 (James H. Carter & John Fellas eds., 2010) ("In other words, ICSID awards are *automatically* recognized in the United States, without need for recognition proceedings."); George K. Foster, *Collecting from Sovereigns: The Current Legal Framework for Enforcing Arbitral Awards and Court Judgments Against States and Their Instrumentalities, and Some Proposals for its Reform*, 25 Ariz. J. Int'l & Comp. L. 665, 702–03 (2008) (explaining that an ICSID "award is automatically enforceable . . . .  States are not permitted to invoke immunity form jurisdiction in connection with the recognition of an adverse ICSID award, or to raise any other objections to recognition."); Schreuer, *The ICSID Convention* 1115 ("*Recognition* [of an ICSID award] is subject only to the requirements of the Convention and may not be refused for reasons of domestic law.  By contrast, Art. 54(3) subjects *execution* to the modalities of the local law of the country where execution is sought.") (citations omitted) (emphases added); Committee Report, 26 ("[T]he stated goal of the ICSID Convention [is] to ensure swift recognition and enforcement of ICSID awards without judicial oversight or interference.").

The federal court thereby must independently examine multiple factors, including "whether there is a constitutional infirmity with the foreign court judgment." *Weininger v. Castro*, 462 F. Supp. 2d 457, 472 (S.D.N.Y. 2006) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982)).

Venezuela's analogy does not hold up. There is no charter for a federal court to examine an ICSID award as it would a state-court judgment for infirmities, because under § 1650a, such awards are entitled to full faith and credit and are subject to substantive review by ICSID alone. And there is no need to inquire, as to any particular application for recognition, whether there is subject matter jurisdiction. That is because § 1650a gives federal district courts exclusive jurisdiction to recognize and enforce such awards as federal judgments. And the FSIA, as explained below, *see infra*, pp. 23–27, independently provides that such courts have subject matter jurisdiction over actions to enforce ICSID arbitral awards.

For these reasons, the Court holds that, under § 1650a, a federal district court, asked to recognize and convert an ICSID award to a judgment, may use the forum state's recognition procedure. The Part One judgment here, the product of using the recognition procedure set out in New York CPLR Article 54, was consistent with the ICSID enabling statute.

## V.       Venezuela's Arguments Based on the FSIA

Venezuela's second argument—which appears to be one of first impression in this District—is that the FSIA, enacted in 1976, supervenes the 1966 ICSID enabling statute, so as to impose requirements on proceedings to recognize ICSID awards when brought against a foreign sovereign. Venezuela argues that the FSIA, which supplies the sole basis for exercising jurisdiction over a foreign sovereign, does not give rise to subject matter jurisdiction over an ICSID recognition proceeding. Alternatively, Venezuela argues that the *ex parte* recognition procedure used here is barred by the FSIA because it is inconsistent with the FSIA's

requirements as to personal jurisdiction, service of process, and venue for cases against foreign sovereigns.  The Court first reviews the history and structure of the FSIA and then considers these arguments.

### A.    Overview of the FSIA

The doctrine of foreign sovereign immunity is based on "reciprocal self-interest, and respect for the power and dignity of the foreign sovereign."  *Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 362 (1955).  For much of its history, "the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *see also The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812).  Because the doctrine's basis is comity rather than the Constitution, federal courts "deferred to the decisions of the political branches— in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities."  *Verlinden*, 461 U.S. at 486.

Until the 1950s, the Executive Branch typically sought immunity for the foreign sovereign.  In 1952, however, the State Department adopted a new, more "restrictive" approach to immunity.  *Samantar v. Yousuf*, 130 S. Ct. 2278, 2285 (2010).  Under that approach, foreign sovereign immunity was "confined to suits involving the foreign sovereign's public acts, and [would] not extend to cases arising out of a foreign state's strictly commercial acts."  *Verlinden*, 461 U.S. at 487.  This policy shift, however, created difficulties, political and practical:  Both the State Department and the courts struggled to apply clear and consistent standards in deciding whether to grant such immunity.  *Id.* at 487–88.

In enacting the FSIA in 1976, Congress sought to provide uniformity and clarity to foreign sovereign immunity.  "Under the FSIA, courts, not the State Department, decide claims

of foreign-sovereign immunity according to the principles set forth in the statute." *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 793 (7th Cir. 2011).  To that end, the FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  "Congress' decision to deal comprehensively with the subject of foreign sovereign immunity in the FSIA, and the express provision in [28 U.S.C.] § 1604 that 'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in [28 U.S.C. §§] 1605–1607,'" precludes other sources of jurisdiction over a foreign state.  *Amerada Hess*, 488 U.S. at 438.

By way of structure, the FSIA, in pertinent part, defines a foreign sovereign, *see* 28 U.S.C. § 1603; sets out the scope of foreign sovereign immunity from jurisdiction, *id.* § 1604; enumerates exceptions to foreign sovereign immunity, *id.* §§ 1605–07; specifies the manner by which a foreign sovereign is to be served, *id.* § 1608; sets out the scope of foreign sovereign immunity from attachment or execution, *id.* § 1609; enumerates exceptions to immunity from attachment or execution, *id.* §§ 1610–11, and specifies the procedures that must be followed when a party seeks to attach a foreign sovereign's assets to satisfy a judgment, *id.* § 1610(c). The FSIA also provides that personal jurisdiction over a foreign state exists over claims within the statute's scope where the statute's service of process requirements have been met, *id.* § 1330.

### B.     Venezuela's Challenge to Subject Matter Jurisdiction

Venezuela argues that the Court lacks subject matter jurisdiction over this recognition action under the FSIA.  The FSIA's text, however, belies that claim.  Two FSIA provisions independently gave the Part One Court (and this Court) subject matter jurisdiction.  Both appear in § 1605, which sets out exceptions to sovereign immunity.  And both have been held by the Second Circuit to confer subject matter jurisdiction over actions arising out of ICSID awards.

23

The first is for arbitral awards.  It states:  "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is brought . . . to confirm an [arbitration] award . . . if . . . the . . . award is . . . governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6)(B).  Section 1605(a)(6)(B) applies here, because the ICSID award against Venezuela was governed by a treaty, the ICSID Convention, "calling for the recognition and enforcement of arbitral awards."  *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) (section 1605(a)(6)(B) "provides an exception to sovereign immunity in cases where a foreign state has agreed to arbitrate and the arbitration agreement is or may be governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards").  And where an FSIA exception to sovereign immunity applies, federal district courts have jurisdiction over "any non-jury civil action against a foreign state."  *Verlinden*, 461 U.S. at 489–90 (quoting 28 U.S.C. § 1330(a)).

The second exception is for implied waivers by the foreign sovereign.  It provides:  "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  Section 1605(a)(1) applies here, because Article 54 of the ICSID Convention represents such a waiver:  Each contracting state is obliged to "recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories."

Both of these exceptions to sovereign immunity have been held by the Second Circuit to apply to actions to enforce ICSID awards against foreign sovereigns.  *See Blue Ridge Invs.*, 735 F.3d at 83–84 ("'[W]hen a country becomes a [Contracting State] to the [ICSID], by the very

provisions of the [ICSID], the [Contracting State] must have contemplated enforcement actions in other [Contracting] States.'") (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993)).  This Court has subject matter jurisdiction under those two exceptions.

In addition, there is, arguably, a third statutory basis for subject matter jurisdiction over such an action.  Section 1604—the provision which confers sovereign immunity—itself textually exempts existing treaty obligations.  It states:  "*Subject to existing international agreements to which the United States is a party at the time of enactment of this Act*[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604 (emphasis added).  The ICSID Convention was such a preexisting international agreement.  It, and the enabling statute, predated the FSIA by a decade.  The italicized opening clause of § 1604, by its terms, leaves in place—and reflects Congress's intention not to disturb—the provisions of the ICSID Convention and enabling statute that contemplated domestic lawsuits against foreign sovereigns to enforce arbitral awards.[18]  *See In re Nw. Airlines Corp.*, 483 F.3d 160, 169 (2d Cir. 2007) ("We also

---

[18] Construing this clause in *Amerada Hess*, the Supreme Court rejected the claim "that certain international agreements entered into by petitioner and by the United States create an exception to the FSIA here."  488 U.S. at 441–42.  It explained that "the FSIA was adopted '[s]ubject to international agreements to which the United States [was] a party at the time of [its] enactment.' § 1604.  This exception applies when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA, … hardly the circumstances in this case."  *Id.* at 442 (citations omitted).  Because subject matter jurisdiction exists here based on the exceptions to sovereign immunity in FSIA §§ 1605(a)(6)(B) and 1605(a)(1), the FSIA and the ICSID Convention are consistent with respect to subject matter jurisdiction.  However, if those exceptions did not exist, the FSIA's clause preserving international agreements as a source of subject matter jurisdiction would apply here, because reading the FSIA to deny subject matter jurisdiction over an action to enforce rights under the ICSID Convention would "expressly conflict" with the Convention.

assume that Congress passed each subsequent law with full knowledge of the existing legal

landscape.") (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)).

In the face of this clear statutory text, Venezuela, in arguing that there is no subject

matter jurisdiction, seizes on two of the Supreme Court's statements describing the FSIA in

*Amerada Hess*.  First, the Court stated, the FSIA "provides the sole basis for obtaining

jurisdiction over a foreign state in federal court."  488 U.S. at 439.  Second, it stated, "Congress'

decision to deal comprehensively with the subject of foreign sovereign immunity in the FSIA,

and the express provision in [28 U.S.C.] § 1604 that 'a foreign state shall be immune from the

jurisdiction of the courts of the United States and of the States except as provided in [28 U.S.C.

§§] 1605–1607,'" precludes other sources of jurisdiction over a foreign state.  488 U.S. at 438.

Venezuela argues that, because Mobil did not comply with the FSIA's requirement of service of

process but instead pursued recognition *ex parte*, subject matter jurisdiction is lacking.

Venezuela Br. 6.

That analysis is unpersuasive, for three reasons.  First, Venezuela ignores the text of the

FSIA, two of whose exceptions to sovereign immunity squarely fit here.  Second, Venezuela

conflates service of process (covered in § 1608) with subject matter jurisdiction (covered in

§§ 1604–07).  Even assuming *arguendo* that Mobil were bound by the FSIA's service of process

requirements, its noncompliance with them would deprive the Court of personal jurisdiction over

the foreign sovereign, *see* 28 U.S.C. § 1330(b), not of subject matter jurisdiction.  Third, when

analyzed in full, *Amerada Hess* defeats Venezuela's theory.  The Supreme Court there explicitly

recognized the statutory exceptions ("sections 1605–1607") to sovereign immunity.  488 U.S. at

438 (quoting 28 U.S.C. § 1604).  And the analytic approach the Court took in the case reinforces

that subject matter jurisdiction is measured by those statutory provisions.  The issue in *Amerada*

*Hess* was whether there was subject matter jurisdiction over a tort action against Argentina to "recover damages for a tort allegedly committed by its armed forces on the high seas." *Id.* at 431. The Court explained that, for such jurisdiction to exist, an FSIA statutory exception to sovereign immunity must apply. *Id.* at 434–35. The Court then inquired whether any such exception applied, *id.* at 439–43; because none did, subject matter jurisdiction was lacking and the Court dismissed the case, *id.* at 443.

This Court therefore rejects Venezuela's argument based on subject matter jurisdiction.

**C.    Venezuela's Challenge to Service of Process, Personal Jurisdiction, and Venue**

**1.    The FSIA's Requirements**

Venezuela's more substantial argument is based on the fact that, in bringing this action *ex parte*, Mobil did not comply with the FSIA's requirements as to service of process and venue. As to service of process, the FSIA sets out a hierarchy of modes. Service shall be made upon a foreign state "in accordance with any special arrangement for service between the plaintiff and the foreign state; or [] if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents," such as the Hague Convention, 28 U.S.C. § 1608(a)(1)–(2). If these are impossible, the FSIA provides for two back-up modes of service, *id.* § 1608(a)(3)–(4).[19] Where service has been properly made and there is subject matter jurisdiction, personal jurisdiction exists over the

---

[19] Specifically, if service cannot be made under the first two methods, then it should be made "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). If that method is unavailable, as well, there is a default mode of service involving certified mail, first sent to the U.S. Secretary of State, and then transmitted "through diplomatic channels to the foreign state." *Id.* § 1608(a)(4).

sovereign.  *Id.* § 1330(b).  As to venue, a civil action against a foreign state must be brought in United States District Court for the District of Columbia, unless another district has a clear nexus to the action, for example, where a substantial part of the events or omissions giving rise to the claim occurred, or where a substantial part of the property that is the subject of the action is situated.  *See* 28 U.S.C. § 1391(f)(1)–(3).

Here, it is undisputed that the service of process requirement was not met, because Mobil brought its petition for recognition, and obtained the Part One judgment, *ex parte*.  For the same reason, this action also did not comply with the requirement of FSIA § 1608 that a foreign state be given 60 days after service or process to file an answer or other responsive pleading.  Finally, the FSIA's venue requirement was also not met, because Mobil, in its petition, did not plead a substantial nexus to this District.[20]

### 2.    Standards for Statutory Construction

The issue presented is therefore one of statutory construction:  Does the FSIA require that its service, venue, and other requirements be met—in effect, that a plenary civil action lawsuit be brought—where an ICSID award creditor seeks to convert its award against a foreign sovereign into a federal court judgment?  Or did it leave intact an ICSID award creditor's ability to use the streamlined recognition procedures of a forum state, including *ex parte* recognition proceedings where state law so provides, as the enabling statute permitted a creditor to do between its enactment in 1966 and the enactment of the FSIA in 1976?

In considering this question, the Court is guided by familiar principles of statutory construction.  Where a statute's text is clear, the Court must enforce it as written.  *See Lamie v.*

---

[20] At argument, Mobil explained that it sought recognition of the ICSID award in this District in anticipation of later finding, and moving to attach, assets of Venezuela located here.  Tr. 31.

*U.S. Tr.*, 540 U.S. 526, 534 (2004).  In determining whether a text is clear, "[t]he first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341 (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998) ("[A] statute is to be considered in all its parts when construing any one of them.").

The Court must heed the clear text of a statute even if it conflicts with an earlier-ratified treaty.  *See Breard v. Greene*, 523 U.S. 371, 376 (1998) ("[A]n Act of Congress . . . is on a full parity with a treaty, and . . . when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null." (quoting *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion)); *see also Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (where treaty and federal statute conflict, "the one last in date will control the other").  Where, however, statutory text is not clear, and there is a preceding treaty, the Court is to construe the statute to avoid conflict with the treaty because, where "fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States."  Rest. (Third) of Foreign Relations Law § 114 (1987) (citing, *inter alia*, *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *Weinberger v. Rossi*, 456 U.S. 25, 33 (1982); *Lauritzen v. Larsen*, 345 U.S. 571, 578 (1958); *Chew Heong v. United States*, 112 U.S. 536, 539–40 (1884)).

### 3. Analysis of the FSIA's Text

Analysis begins with the FSIA's text.  That text is silent on the issue presented: whether the FSIA's requirement of a plenary action against a sovereign was intended to apply in the context of recognition of ICSID awards.  The FSIA does not refer to recognition proceedings at all, save to provide that actions to confirm awards "governed by a treaty or other intentional agreement in force . . . calling for the recognition and enforcement of arbitral awards" fall within the FSIA's exception to sovereign immunity for arbitral awards.  28 U.S.C. § 1605(a)(6)(B); *see also id.* § 1610(a)(6) (establishing exception to sovereign immunity from attachment of assets where "the judgment is based on an order confirming an arbitral award rendered against the foreign state" and where the attachment is consistent with the arbitral agreement).  The statute also does not refer to ICSID.

Contrary conclusions may be drawn from the statute's silence.  Venezuela argues that because the FSIA is the only source of subject matter jurisdiction over a foreign sovereign, *see Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993), it follows that its requirement of a plenary action was meant to apply to *all* proceedings brought against foreign sovereigns, including the non-substantive one in which an award creditor seeks to convert an ICSID award into a federal judgment.  The absence of a textual exception to this general rule, Venezuela argues, means that there is no such exception for an action to recognize an ICSID award.  And therefore, it argues, time-consuming and cumbersome though this process may be, to convert an ICSID award against a foreign sovereign into a judgment, an award creditor must bring a plenary lawsuit against the sovereign, in a district in which there is venue under the FSIA, and complying with the FSIA's requirements as to service of process and its timetable for an answer.  From Venezuela's argument, it also follows that, for the award creditor to obtain relief (conversion of

the award into a judgment) in such a lawsuit, the creditor would have to move for a judgment based on the award, presumably, by moving for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), or for summary judgment under Rule 56.  *See* Venezuela Br. 2 (arguing that to recognize an ICSID award requires "the institution of a plenary action, on notice, with appropriate service of process"); *see also id.* at 14; Tr. 5 (arguing that to recognize an ICSID award, a creditor must "go to the D.C. federal district court [and] file their complaint [and] serve [the foreign state] in accordance with the provisions of section 1608(a).").

In its brief, Mobil largely ignores the FSIA.  It treats the ICSID enabling statute as the only relevant statute.  But, in fact, there are aspects of the FSIA's text that support Mobil's view that Congress did not have ICSID award recognition in mind when it prescribed service, venue, and other requirements for lawsuits against sovereigns.

First, the FSIA evinces an intention to leave existing practice under international treaties undisturbed.  As noted, FSIA § 1604, the immunity provision, states:  "*Subject to existing international agreements to which the United States is a party at the time of enactment of this Act*[,] a foreign state shall be immune from the jurisdiction [of U.S. courts] except as provided [in] this chapter."  28 U.S.C. § 1604 (emphasis added).  Although addressed to the existence of immunity, not the mechanics by which an action is to be brought against a non-immune sovereign, § 1604 fairly reflects an intention not to revise existing law or practice in an area governed by treaty.  This intention is easy to understand in the context of a statute animated in part by considerations of international comity.

Second, the FSIA repeatedly uses terms that presuppose litigation over a *contested* issue, *e.g.*, a conventional lawsuit in which liability, damages, and/or the availability of attachment are

at issue.[21]  This terminology uneasily fits the non-substantive, mechanistic context of ICSID

award recognition, in which, upon authentication of the award, its conversion into a judgment is

automatic.  It suggests that, in enacting the FSIA, Congress had in mind a conventional lawsuit

against a sovereign to resolve issues of liability and/or damages, *see, e.g.*, *Republic of Argentina*

*v. Weltover, Inc.*, 504 U.S. 607 (1992) (breach of contract action against Argentina and its central

bank); *Amerada Hess*, 488 U.S. at 431 (tort action against Argentina to "recover damages for a

tort allegedly committed by its armed forces on the high seas"); *Verlinden*, 461 U.S. at 483

(breach of contract action against the Central Bank of Nigeria), and not the *rara avis* that is a

proceeding to convert a ICSID award into a federal court judgment.

Finally, as a matter of historical fact, there were relatively few ICSID arbitrations held

between 1966 and 1976, because ICSID was in its infancy and few litigants had pursued cases in

that forum.  *See* Dolzer & Schreuer, *Principles of Int'l Inv. Law* 20 ("ICSID's caseload remained

quite modest for two decades" but proliferated later, such that ICSID is now "the main forum for

the settlement of investment disputes"); *see also id.* at 224.  As a practical matter, it is reasonable

to infer that Congress did not have the unique context of ICSID award recognition in mind when

it enacted the FSIA.

---

[21] *See, e.g.*, 28 U.S.C. § 1605(a)(3)–(4) (in identifying exceptions to sovereign immunity,
referring to "actions" where rights in property are "in issue"); *id.* § 1605(a)(5) (referring to
actions "in which money damages are sought against a foreign state for personal injury or
death");  *id.* § 1605(g) (addressing "limitation[s] on discovery"); *id.* § 1606 (addressing "extent
of liability," and providing that standards for judging liability of a foreign sovereign are the same
as for a private individual, except as to punitive damages); *id.* § 1607 (addressing
"counterclaims"); *id.* § 1608 (in addressing service, referring to the "summons and complaint,"
the "plaintiff," the "notice of suit," and the "answer or other responsive pleading," and noting
that a "judgment by default" cannot issue against a foreign state unless "the claimant establishes
his claim or right to relief by evidence satisfactory to the court").

There is some force to both competing perspectives.  Neither is obviously correct based on the statute's text.  The Court concludes that the FSIA's language does not have "a plain and unambiguous meaning with regard to the particular dispute in the case," *Sigmon Coal*, 534 U.S. at 450 (citation omitted), and that it leaves congressional intent unclear as to whether the procedures the FSIA prescribes were to apply to conversion of ICSID awards against foreign sovereigns.  The FSIA's legislative history also does not appear to speak to this issue, a point confirmed at argument.  *See* Tr. 38.

### 4.      Conflict with the ICSID Convention and the ICSID Enabling Statute

To resolve the ambiguity, it is therefore appropriate to examine the FSIA in broader context.  In particular, would construing the FSIA to require ICSID award creditors who wish to convert their awards into federal court judgments to proceed by plenary lawsuit be in tension, or outright conflict, with the ICSID Convention or its enabling statute?  If so, the Court is to construe the silent FSIA so as to avoid interference with the treaty and statute.  *See* Rest. (Third) of Foreign Relations Law § 114 (1987) (citing, *inter alia*, *Charming Betsy*, 6 U.S. (2 Cranch) at 118; *Rossi*, 456 U.S. at 33; *Lauritzen*, 345 U.S. at 578; *Chew Heong*, 112 U.S. at 539–40).

Based on the Court's review of the history and purposes of the ICSID Convention, and the texts of both the Convention and the ICSID enabling statute, requiring a plenary lawsuit to obtain recognition of an ICSID award would be, at a minimum, in significant tension with the intentions of the Convention and the enabling statute as to the process of recognition.  A review of that history is instructive.

The ICSID Convention was drafted in 1965 by delegates from many nations, including the United States.  In considering the recognition and execution of ICSID awards, the delegates drew upon, referenced, and in important respects deliberately deviated from the terms of an

33

earlier treaty, the foundational treaty in the area of international arbitration: the Convention on

the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention").  To

understand the ICSID Convention's view and treatment of award recognition and execution, it is

important therefore to understand the New York Convention.  *See, e.g.*, *Yusuf Ahmed Alghanim*

*& Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997) (looking to prior treaties to explain

context for, and purpose of, treaty at issue).

  The New York Convention was negotiated in 1958 and entered into force in 1959.  It was

adopted to facilitate international enforcement of arbitral awards.  *See Scherk v. Alberto-Culver*

*Co.*, 417 U.S. 506, 510–11 (1974).  The prior regime, the Convention on the Execution of

Foreign Arbitral Awards ("the Geneva Convention"), Sept. 26, 1927, 92 L.N.T.S. 301, was

viewed as too cumbersome.  *See Toys "R" Us*, 126 F.3d at 21 ("The primary defect of the

Geneva Convention was that it required an award first to be recognized in the rendering state

before it could be enforced abroad," a requirement known as "double *exequatur*") (citing, *inter*

*alia*, Geneva Convention arts. 1(d), 4(2)).  By 1965, 23 nations had ratified, and an additional 10

had signed, the New York Convention.[22]

  The scope of the New York Convention is far broader than ICSID's, in that its coverage

extends to disputes between private parties, and to arbitral institutions generally.  *See Toys "R"*

*Us*, 126 F.3d at 21 (citing New York Convention article I(1)).  It requires courts in contracting

states to (1) give effect to private agreements to arbitrate, and (2) recognize and enforce

arbitration awards that were rendered either in other contracting states or "by permanent arbitral

---

[22] Today, the New York Convention has more than 150 member states, including the United
States, *see* 21 U.S.T. 2517, T.I.A.S. No. 6997.  *See* New York Convention Countries, *available*
*at* www.newyorkconvention.org/contracting-states/list-of-contracting-states (last visited
February 12, 2015).

bodies." New York Convention arts. I–II. Under the New York Convention, a domestic court of a contracting state is empowered to interpret the parties' underlying agreement and to order the parties to submit their dispute to arbitration, where the parties have so agreed, unless the court "finds that the said agreement is null and void, inoperative or incapable of being performed." *Id.* art. II. As to recognition, the New York Convention provides that, once an arbitral award has issued, the award creditor shall "supply" the court with the original award or a certified copy. *Id.* art. IV. Courts in a contracting state, in turn, are required to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon," subject to certain conditions. *Id.* art. III.

Significantly, these conditions permit the award debtor to contest recognition on a variety of grounds. The New York Convention sets out 16 grounds (in seven subsections) on which a court can "refuse[]" to recognize an arbitral award. *Id.* art. V. Fourteen bear on the validity of the arbitration process or award: The debtor may argue, for example, that the underlying arbitration agreement is invalid, that the arbitral panel was improperly composed, that the decision rendered was outside the scope of the arbitration agreement, and/or that the award was not final. *Id.* art. V(1)(a)–(e).[23] The remaining two grounds arise from the domestic law of the

---

[23] Article V, in its entirety, provides:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
   (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
   (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

recognizing state.  They permit a court to refuse to confirm an award where the dispute's subject matter cannot be arbitrated under the law of the recognizing state, or where recognition "would be contrary to the public policy of that country."  *Id.* art. V(2)(a)–(b).

To be sure, confirmation of awards under the New York Convention—and under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, the enabling statute which implements and provides for enforcement in U.S. courts of awards rendered under the Convention—is intended to proceed on an expedited basis.  A party seeking confirmation of an award under the Convention thus need not file a complaint, but may instead file a petition to confirm the award.  And the petition can be resolved on the papers, without the need for oral testimony or discovery.  However, the exceptions set out in the Convention invite some substantive review.  And, based

---

(c)  The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d)  The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e)  The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2.  Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a)  The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b)  The recognition or enforcement of the award would be contrary to the public policy of that country.

on these exceptions, federal courts, presented with petitions to confirm—or to vacate—awards rendered under the Convention, are frequently called upon to undertake such review.[24]

Further, in light of the substantive nature of the confirmation process, the requirements of personal jurisdiction, service of process, and venue have generally been held by federal courts to apply to petitions to confirm arbitral awards under the New York Convention.[25]

The ICSID Convention's history[26] reflects that the delegates who drafted it originally planned to use the New York Convention's recognition and enforcement provisions.  *See*

---

[24] *See, e.g.*, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 307 (2010) (addressing scope of parties' agreement to arbitrate); *Zeiler v. Deitsch*, 500 F.3d 157, 160 (2d Cir. 2007) (addressing whether an arbitration panel was properly composed, given resignation of one of three arbitrators); *Avis Rent A Car Sys., Inc. v. Garage Employees Union, Local 272*, 791 F.2d 22, 25 (2d Cir. 1986) (addressing whether arbitrator exceeded his powers); *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, No. 96 Civ. 5853 (LMM), 1996 WL 728646, at *1 (S.D.N.Y. Dec. 18, 1996) (addressing whether arbitral award was irrational and whether arbitrators manifestly disregarded the law and the terms of the parties' agreement) *aff'd*, 126 F.3d at 15).

[25] *See, e.g.*, *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 396–97 (2d Cir. 2009) (requiring jurisdiction over defendant's person or property to enforce arbitral award under New York Convention) (citing *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 178–79 (3d Cir. 2006); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1120–22 (9th Cir. 2002); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory*," 283 F.3d 208, 212–13 (4th Cir. 2002)); *see also CME Media Enterprises B.V. v. Zelezny*, No. 01 Civ. 1733 (DC), 2001 WL 1035138, at *2 (S.D.N.Y. Sept. 10, 2001) (addressing whether service of process was proper); *see also Kelso Enters. Ltd. v. M/V DIADEMA*, No. 08 Civ. 8226 (SAS), 2009 WL 1788110, at *3 (S.D.N.Y. June 23, 2009) (addressing appropriate venue for district court action arising under New York Convention), *aff'd sub nom. Kelso Enters. Ltd. v. A.P. Moller-Maersk*, 375 F. App'x 48 (2d Cir. 2010) (summary order).

[26] In interpreting treaties, it is common to "consider[] as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations."  *Medellin v. Texas*, 552 U.S. 491, 506 (2008) (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)); *see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999) ("The text, drafting history, and underlying purpose of the Convention, in sum, counsel us to adhere to a view of the treaty's exclusivity shared by our treaty partners."); *United*

Schreuer, *The ICSID Convention* 1101; Analysis of Documents Concerning the Origin and the Formulation of the [ICSID] Convention 246 (1970) ("*History*, Vol. I"); Documents Concerning the Origin and the Formulation of the [ICSID] Convention 65, 272, 429, 521, 671, 888, 1018 (1968) ("*History*, Vol. II").  Delegates debated at length whether to retain a possibility of judicial review of an award under domestic law, either by adopting the various grounds for "refusal" under the New York Convention or by providing for a narrower ground for refusal based on the public policy of the forum state.  Schreuer, *The ICSID Convention* 1128–29; *History*, Vol. II, 661, 671, 699, 887, 888–95.

A number of delegates, however, urged that the ICSID Convention be a "self-contained regime" with *no* judicial review.  Schreuer, *The ICSID Convention* 1128; *History*, Vol. II, 425–30, 519, 522, 575.  A compromise resulted:  Contracting states were required, without exception, to *recognize* arbitral awards, but they were obliged to *enforce* only the pecuniary obligations of awards, not other aspects such as specific performance.  Schreuer, *The ICSID Convention* 1129; *History*, Vol. II, 989–92, 1018.

Consistent with this approach, the delegates structured the ICSID Convention's chapter on recognition and enforcement to consist of three articles (Articles 53 through 55).

Article 53 is directed to *the arbitrating parties*.  As noted, it provides that an ICSID award is "binding on the parties," is not subject to appeal "or to any other remedy except those

---

*States v. Stuart*, 489 U.S. 353, 365–66 (1989); *Choctaw Nation v. United States*, 318 U.S. 423, 431–32 (1943).

provided for in this Convention," [27] and it obligates each party to comply with the terms of the award.

Article 54 is directed to *contracting states*.  As noted, it requires them to recognize an ICSID award "as binding" and to enforce the award's pecuniary obligations "as if it were a final judgment of a court in that State."  ICSID Convention art. 54(1).  There are no exceptions to the contracting state's duty to recognize the award.[28]  Article 54 also directs that "[a] party seeking recognition or enforcement in the territories of a Contracting State shall furnish" to a competent court a certified copy of the award.  *Id.* art. 54(2).  Such a court therefore is to review only the award's authenticity; recognition thereafter is mechanistic and effectively "automatic."  Schreuer, *The ICSID Convention* 1126.  Article 54 also provides that, after recognition, *execution* is governed by the domestic laws "in the State in whose territories such execution is sought."  ICSID Convention art. 54(3).

Finally, Article 55 is directed to *execution*.  It states:  "Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from *execution*."  *Id.* art. 55 (emphasis added).[29]

---

[27] Earlier portions of the ICSID Convention provide for the possibility of annulment, revision, and interpretation by ICSID of an award.  *See* ICSID Convention arts. 50–52.

[28] *See* Schreuer, *The ICSID Convention* 1143 ("The obligation to recognize an award as binding under Art. 54(1) is unconditional."); *see also supra*, n.17.

[29] Because this provision allows domestic law to inhibit an award creditor's ability to collect on an ICSID award, a leading commentator has described Article 55 as "the Achilles' heel" of the Convention—a "weak point" in "[t]he otherwise effective machinery of arbitration."  Schreuer, *The ICSID Convention* 1144.  But this was a deliberate choice.  The delegates considered, but rejected, providing that consent to ICSID jurisdiction was a waiver of immunity from execution. *See id.* at 1145.

Articles 53 through 55 of the ICSID Convention thus represented a considered decision to depart fundamentally from the New York Convention, in denying courts any power to review the parties' agreement to arbitrate, to decline to hear particular types of cases, and, most salient here, to refuse to recognize ICSID awards.[30]

As noted, Congress enacted § 1650a in 1966 to implement the ICSD Convention.  In mandatory terms, it provides that the pecuniary terms of an ICSID award "shall be enforced."  And two other aspects of the statute's text reflect Congress's expectation, in accord with the ICSID Convention, that ICSID award recognition would be non-substantive and automatic.

*First*, § 1650a uses a phrase conspicuously absent from Chapter 2 of the FAA, the enabling statute for the New York Convention.  It requires that an ICSID award be given "full faith and credit":  "The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  Congress's use of "full faith and credit" in the ICSID enabling statute is significant, because that term has an acquired meaning.  It tracks the full faith and credit provision of the Constitution, *see* U.S. Const. art. IV, § 1.  That provision, in

---

[30] The ICSID Convention's rules also differed from those of the New York Convention in that they were binding.  The New York Convention's rules, by contrast, were default rules, which were subject to existing agreements among the parties, to the law or treaties of the country where the award was enforced, *see* New York Convention art. VII, and to the right of a contracting country at the time of ratification to limit the treaty's reach to particular types of cases, *see id.* art. I (Contracting party may "declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State.  It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.").

turn, makes final the determinations of sister states, such that, subject to exceptions inapplicable here, no attack can be made outside a state on a judgment rendered therein.

As the Supreme Court has held of the Constitution's full faith and credit provision: "Regarding judgments, . . . the full faith and credit obligation is exacting.  A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force."  *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) (citations and footnote omitted); *accord Williams v. North Carolina*, 317 U.S. 287, 294 (1942).[31]  There are only limited exceptions to the Constitution's requirement of full faith and credit.  None apply in the context of an ICSID award.[32]

---

[31] Drawing upon the Supreme Court's precedents, one commentator has helpfully summarized the concept of full faith and credit as follows:

> If a court in state "F-1" renders a final judgment in a case over which it possesses both personal and subject matter jurisdiction, its judgment is entitled to full faith and credit in state "F-2," even if that judgment is based on a mistake of fact or law.  If the losing litigant wants to correct the error, the litigant must do so in F-1's courts, either on appeal or through some other type of direct attack.  Once the judgment is final according to the law of F-1, however, the Full Faith and Credit Clause prohibits collateral attack in F-2.  This is the Iron Law of Full Faith and Credit. . . .

> [T]he Full Faith and Credit Clause requires that the doctrines of repose and finality be given interstate effect.

William L. Reynolds, *The Iron Law of Full Faith and Credit*, 53 Md. L. Rev. 412, 413–15 (1994) ("Reynolds") (footnotes omitted).

[32] Under the full faith and credit doctrine, a "recognizing" court need not recognize the "rendering" court's underlying judgment where that judgment is not on the merits, is not yet final, resulted from fraud, or was issued in the absence of personal or subject matter jurisdiction. *See, e.g.*, *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir. 1968) (non-merits exception); *Lynde v.*

Section § 1650a's use of "full faith and credit" is significant for another reason.  Under the full faith and credit doctrine, for a sister state's judgment to be recognized, it is not necessary that there be personal jurisdiction over the judgment debtor in the recognizing court.  Instead, a mechanistic process of interstate registration is commonly used.[33]  It is reasonable to assume that, when Congress used the term "full faith and credit" in the ICSID enabling statute, it

───────────

*Lynde*, 181 U.S. 183, 187 (1901) (lack of finality exception); *Cole v. Cunningham*, 133 U.S. 107, 112 (1890) (lack of jurisdiction and fraud exceptions); *see also* Reynolds, *supra*, at 417–30. These exceptions have no bearing in the context of an ICSID award because, under the ICSID Convention, an ICSID award necessarily reflects consent by both parties to ICSID's jurisdiction, follows a merits arbitration, represents a final judgment not subject to substantive challenge within the courts of a contracting state, and equates to a judgment entered by a state's highest court.

[33] As the Supreme Court has explained:

> Congress has provided for the interdistrict registration of federal-court judgments for the recovery of money or property.  28 U.S.C. § 1963 (upon registration, the judgment "shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner").  A similar interstate registration procedure is effective in most States, as a result of widespread adoption of the Revised Uniform Enforcement of Foreign Judgments Act, 13 U.L.A. 149 (1986) [] (listing adoptions in 44 States and the District of Columbia).

*Baker*, 522 U.S. at 235 n.8; *see also* Siegel, *N.Y. Practice* § 435 ("The background of Article 54 suggests that there is no need to demonstrate that New York has jurisdiction."); 11 Jean E. Maess et al., *Federal Procedure Lawyers Edition* § 31:28 ("Personal jurisdiction in the court where a judgment is being registered is not required by 28 U.S.C.A. § 1963."); *see generally Williams*, 317 U.S. at 294 ("Art. IV, § 1 [of the Constitution] and the [congressional] Act of May 26, 1790 require that 'not some but full' faith and credit be given judgments of a state court.  *Davis v. Davis*, 305 U.S. 32, 40 [(1938)].  Thus even though the cause of action could not be entertained in the state of the forum either because it had been barred by the local statute of limitations or contravened local policy, the judgment thereon obtained in a sister state is entitled to full faith and credit.") (numerous citations omitted); *cf.* Registration in Federal District Court of Judgment of Another Federal Court Under 28 U.S.C.A. § 1963, 194 A.L.R. Fed. 531 § 2[b] (2004) ("To register a judgment, counsel should file a certified copy of the judgment with the clerk of the registering court, who will enter it on the records in substantially the same manner as if judgment had been rendered by the registering court.") (citing, *inter alia*, *Arenas v. Sternecker*, 109 F. Supp. 1 (D. Kan. 1953)).

intended to adopt the familiar meaning of this term of art.  *See Molzof v. United States*, 502 U.S. 301, 307 (1992).

*Second*, the ICSID enabling statute provides:  "The Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) shall not apply to enforcement of awards rendered pursuant to the convention."  28 U.S.C. § 1650a.  Chapter 2 of the FAA, as noted, implemented the New York Convention. Section 1650a thereby reflected Congress's intention that the New York Convention, which provided for limited substantive review of—and the right of the award debtor to challenge— arbitral awards would *not* apply to the enforcement of ICSID awards.

When considered in light of the foregoing history and text, Venezuela's claim that the FSIA should be read to require an award creditor to bring a plenary lawsuit to recognize an ICSID award is, therefore, deeply problematic.  Venezuela's construction would bring the FSIA into grave tension with the objectives of the ICSID Convention and of Congress.  That is because the history and terms of the ICSID Convention unavoidably reveal that the contracting states to the ICSID Convention intended to put in place an expedited and automatic recognition procedure.  They sought to depart from, not to double down on, the model of a contested recognition process used under the New York Convention.

Ironically, if Venezuela were literally held to its advocacy here, requiring the creditor to file a "plenary action" (initiated by a complaint and resolvable only upon full motions practice) would give Venezuela *more* process than it was due under the New York Convention, under which at least a streamlined petition-based confirmation process is used.  And if Venezuela were taken instead simply to advocate the use under the ICSID Convention of the procedures used under the New York Convention, that notion, too, would plainly be odds with the intent of the ICSID Convention.

And also with Congress's intent:  Congress's use of the term "full faith and credit" in the ICSID enabling statute, and § 1650a's proviso that the FAA's enforcement procedures were *not* to apply to ICSID awards, reveals that it, too, intended that an ICSID award be automatically recognized, not subject to contested litigation.[34]  Accordingly, although the ICSID enabling statute does not affirmatively prescribe the procedures to be used for domestic recognition of an ICSID award, the words it does use are highly revealing.  When understood in historical context, they underscore Congress's expectation that award recognition would be automatic and not subject to contest.

Notably, legislatures in a number of other contracting states drew the same conclusion.  A number of them permit immediate, and *ex parte*, recognition of ICSID awards.  *See, e.g.*, Part 62.21(2)(c) of the United Kingdom's Rules of Civil Procedure (setting out requirements for registration; registration may be obtained *ex parte*, but service must be made on judgment debtor prior to execution); Australia Fed. Court Rule Order 68 (setting out requirements for registration; application for registration "may be made without notice to any person"); *see also* Schreuer, *The*

---

[34] By the end of 1975, at least 16 states had adopted the 1964 UEFJA and were using *ex parte* proceedings to recognize sister-state judgments.  *See, e.g.*, Wash. Stat. § 6.36.010 *et seq.* (Mar. 18, 1953); Or. Rev. Stat. § 24.105 *et seq.* (May 21, 1955); R.I. Gen. Laws 1956, § 9-32-1 *et seq.*; Wyo. Stat. Ann. § 1-17-701 *et seq.* (Feb. 11, 1965); 42 Pa. Cons. Stat. § 4306 (May 21, 1965); Wisc. Stat. Ann. § 806.24 (Nov. 24, 1965); 12 Okl. St. Ann. § 719 *et seq.* (Apr. 15, 1968); Colo. Rev. Stat. Ann. § 13-53-101 *et seq.* (July 1, 1969); N.D. C.C. § 28-20.1-01 *et seq.* (July 1, 1969); N.Y. CPLR 5401 *et seq.* (Sept. 1, 1970); Ariz. Rev. Stat. § 12-1701 *et seq.* (Aug. 13, 1971); Ak. Stat. § 09.30.200 *et seq.* (Aug. 16, 1972); Conn. Gen. Stat. Ann. § 52-604 *et seq.* (June 17, 1973); Id. Stat. § 10-1301 *et seq.* (July 1, 1974); 14 Me. Rev. Stat. Ann. § 8001 *et seq.* (May 22, 1975); S.D. Stat. § 15-16A-1 *et seq.* (1975).  Another two adopted such laws in 1976.  *See* S.C. Code 1976, § 15-35-900 *et seq.*; Tenn. Stat. § 26-6-101 (1976).  Although there is no evidence that Congress focused at the time it passed the FSIA on the availability of these forum-state procedures for use in ICSID award recognition proceedings involving a sovereign debtor, Congress is presumed to have been aware of existing state law at the time it enacts legislation. *See, e.g.*, *In re Nw. Airlines Corp.*, 483 F.3d at 169.  Had Congress intended by passing the FSIA to preclude use of such procedures, it could have said so.

*ICSID Convention* 1116–19 (summarizing French case law, which, too, permits *ex parte*
registration through the "*exequatur*" procedure); *see generally El Al Israel Airlines*, 525 U.S. at
176 (interpreting the treaty at issue by looking to its text, drafting history, purpose, and
interpretation "by our treaty partners"); *Toys "R" Us, Inc.*, 126 F.3d at 21 ("This interpretation
of Article V(1)(e) also finds support in the scholarly work of commentators on the Convention
and in the judicial decisions of our sister signatories to the Convention.").

Venezuela's argument is flawed for another reason. Reading into the FSIA's silence a
congressional intention to graft onto the ICSID enabling statute the FSIA's requirements as to
service of process, personal jurisdiction, and venue would not serve any practical purpose.
Whatever parties participated in the award recognition process—whether it was conducted *ex
parte* or on notice to the debtor—one conclusion is certain: Registration of ICSID awards was
intended to be automatic. There are no grounds for challenging the award in the contracting
state. Any challenge to the award is to be made within ICSID. Permitting an ICSID award to be
converted, *ex parte*, into a federal judgment does not deprive the award debtor of a right (such as
a debtor has under the New York Convention) to challenge the award. It would merely provide
an avenue for delay.

This case, in fact, supplies an excellent example. Venezuela has not identified any
substantive defect in the award. Its motion to vacate the Part One Judgment is based solely on
asserted procedural infirmities under § 1650a and the FSIA. Venezuela has not identified any
legal basis on which, were it to be granted the right to be sued and to participate in the award
recognition process, it could, or would, challenge ICSID's award to Mobil. But requiring the
creditor to comply with the FSIA's procedures for such a lawsuit when the award debtor is a
sovereign—including potentially having to use the time-consuming process for serving a foreign

sovereign under the Hague Convention, or having to litigate the adequacy of personal jurisdiction or of Mobil's venue choice—could lead to substantial delays.[35]

And construing the FSIA to permit ICSID creditors to continue to be able to use (via borrowing) state recognition procedures as permitted by the ICSID enabling statute would leave foreign sovereigns fully able to vindicate the rights they do have.  A sovereign is at liberty to challenge the award within ICSID, to seek its annulment, or, as Venezuela has done, to seek its modification.  *See* ICSID Conv. arts. 50–52; *see generally* Schreuer, *The ICSID Convention* 868–1075.  And the strong protections that the FSIA affords sovereigns at the execution and attachment stages are in no way impeded by this holding.  The FSIA prevents a judgment creditor from executing on a foreign sovereign's assets until a court has ordered execution.  A court may order execution only after it has "determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under [28 U.S.C. § 1608(e), an FSIA service provision]."  28 U.S.C. § 1610(c).  The FSIA also makes available to judgment creditors only *commercial* property of the sovereign—other property of the sovereign's is immune.  *Id.* § 1610(a).  *See Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011) ("[T]he execution immunity afforded sovereign property is broader than the jurisdictional immunity afforded the sovereign itself.").

---

[35] According to media reports that Mobil attached to its opposition to the motion to vacate, Venezuela has stated that it will refuse to pay the ICSID award, even if it fails within ICSID to unsettle that award.  *See* Dkt. 26, Ex. 2 (Nathan Crooks & Jose Orozco, *Chavez Says Venezuela Won't Accept World Bank Arbitration*, Bloomberg, Jan. 9, 2012) (reporting that Venezuela's then-President Hugo Chavez has said, "[w]e won't recognize any decisions from the ICSID," and that Mobil is "seeking the impossible, that we pay what we will never pay").  The Court, of course, has not relied on these reports in reaching its legal conclusions.  The Court recites them here to illustrate the mischief that Venezuela's construction of the FSIA could invite, by enabling a contumacious award debtor to use the FSIA's procedural requirements as a tool to delay paying on an ICSID award.

Use of an *ex parte* process to convert an ICSID award into a judgment does not interfere with any of these rights.  Creation of a domestic judgment is a predicate to, not a substitute for, execution upon a judgment.  And where creditors have not abided by the FSIA's requirements, courts have nullified their actions, *see, e.g.*, *Gadsby & Hannah v. Socialist Republic of Romania*, 698 F. Supp. 483, 485–86 (S.D.N.Y. 1988); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F. Supp. 420, 423 (S.D.N.Y. 1987), recognizing that "the procedures mandated by 1610(c) are in place to ensure that sufficient protection is afforded to foreign states that might be defendants in actions in United States Courts," *Levin v. Bank of N.Y.*, No. 09 Civ. 5900 (RPP), 2011 WL 812032, at *7 (S.D.N.Y. Mar. 4, 2011); *cf. LETCO*, 650 F. Supp. at 77–78.

In this case, following the Part One judgment, Mobil put Venezuela on notice of the judgment, *see* Dkt. 20, as required by CPLR Article 54; under the FSIA, Venezuela is entitled to a "reasonable" amount of time to comply with the Part One judgment before any attachment or execution is permitted, *see* 28 U.S.C. § 1610(c); *Trans Commodities, Inc. v. Kazakstan Trading House*, No. 96 Civ. 9782 (BSJ), 1997 WL 811474, at *2–3 (S.D.N.Y. 1997).  Venezuela will also be free, consistent with the FSIA, to litigate other aspects of efforts Mobil may make to collect on its judgment domestically.  *See, e.g.*, *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2254–58 (2014) (breadth of post-judgment discovery); *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 66–67 (D.D.C. 2001) (whether "reasonable" time had elapsed prior to execution).

The Court therefore rejects Venezuela's claim that the FSIA *sub silentio* amended the ICSID enabling statute, so as to require award creditors to pursue recognition of ICSID awards against foreign sovereigns by means of plenary actions in compliance with the FSIA's

requirements as to process, personal jurisdiction, and venue.[36]  The procedures applicable to the

recognition process are instead those authorized by the ICSID enabling statute.  And it, for the

reasons reviewed here, permits a court to adopt the judgment recognition procedures of the

forum state.  Accordingly, Venezuela's motion to vacate the Part One judgment is denied.

---

[36] To the extent Venezuela makes a personal jurisdiction argument independent of the FSIA, it lacks merit.  Personal jurisdiction ordinarily is not required in recognition proceedings, whether state or federal.  The relevant issue is instead whether there was jurisdiction over the award debtor at the time the underlying award was litigated; that is not in dispute here.  *See, e.g.*, Siegel, *N.Y. Practice* § 435 ("The background of Article 54 suggests that there is no need to demonstrate that New York has jurisdiction."); 11 Maess et al., *Fed. Pro. Lawyers Edition* § 31:28 ("Personal jurisdiction in the court where a judgment is being registered is not required by 28 U.S.C.A. § 1963.").  And even if personal jurisdiction *were* necessary, it was waived here.  Where a nation becomes a contracting party to the ICSID Convention, "by the very provisions of the [ICSID], the [Contracting State] must have contemplated enforcement actions in other [Contracting] States," including the United States.  *Blue Ridge Invs.*, 735 F.3d at 83–84 (quoting *Seetransport*, 989 F.2d at 578); *LETCO*, 650 F. Supp. at 76 ("Liberia clearly contemplated the involvement of the courts of any of the Contracting States, including the United States as a signatory to the Convention, in enforcing the pecuniary obligations of the award.").  This constitutes the "consent" or agreement to a jurisdiction that courts have found required in the New York Convention context.  *See Transatl. Bulk Shipping Ltd. v. Saudi Chartering S.A.*, 622 F. Supp. 25, 27 (S.D.N.Y. 1985) ("Some basis must be shown, whether arising from the respondent's residence, his conduct, his consent, the location of his property or otherwise, to justify his being subject to the court's power."); *see generally City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011) ("Personal jurisdiction, unlike subject-matter jurisdiction, can, however, be purposely waived or inadvertently forfeited.") (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)).

To the extent that, in challenging venue, Venezuela relies on *Continental Casualty v. Argentine Republic*, 893 F. Supp. 2d 747 (E.D. Va. 2012), its reliance is misplaced.  The award creditor there filed a *plenary* action to enforce an ICSID award; given that, the district court held that the creditor was obliged to bring such an action in compliance with the FSIA, and transferred the case to the District of Columbia.  *Id.* at 754.  Whether or not this ruling was correct, *Continental Casualty* does not speak to whether a creditor is free alternatively to pursue recognition through an *ex parte* proceeding such as under CPLR Article 54.  Notably, *Continental Casualty* cited case law from this District that approved of the use of *ex parte* award registration.  *See id.* at 751 n.9 (citing *Siag*, 2009 WL 1834562).  Every other ICSID case (besides *Continental Casualty*) has treated venue in New York as proper.  *See, e.g.*, *Siag*, 2009 WL 1834562, at *1–3; *LETCO*, 650 F. Supp. at 76; *Blue Ridge Invs.*, 902 F. Supp. 2d 367.

## VI.   Effect of Venezuela's Pending Application to Modify the ICSID Award

After Venezuela moved to vacate the Part One judgment, it applied to ICSID for revision of the arbitral award.  Mobil Br. 2; Dkt. 29 ("Venezuela Rep. Br."), 2 & n.1.  Thereafter, the ICSID Secretary-General stayed enforcement of the award.  *See* Pizzurro Reply Decl., Ex. A.  As a result, the award cannot currently be enforced because the parties are litigating the precise amount that will be offset on the ground that Mobil has already received a separate award against the national oil company of Venezuela.  *See* Tr. 18 ("As part of the arbitra[l] award, there is to be a set-off with respect to the moneys [Mobil] previously received from PDVSA, the state-owned oil company."); Award ¶ 404(e).

At argument, the Court pursued this subject with counsel.  Tr. 11, 12, 18.  The Court's concern was that if the Part One judgment recognizing the award in Mobil's favor remained in place and was not stayed, Mobil, in theory, could seek attachment of more than the sum total of assets to which it may ultimately be held entitled by ICSID.  *Id.* at 13.

The prudent solution is for the Court, pending the outcome of Venezuela's application for revision, to stay enforcement of the Part One judgment.  *See id.* at 23–24.  As Mobil acknowledged, under the FSIA, it cannot, in any event, attach Venezuelan assets without judicial permission.  *See id.* at 20; 28 U.S.C. § 1610(c).  The Court, accordingly, stays enforcement of the Part One judgment, pending the resolution of the application currently pending before ICSID.

## CONCLUSION

For the foregoing reasons, the Court denies Venezuela's motion to vacate the Part One judgment.  The Court, however, stays enforcement of the judgment, pending the outcome of Venezuela's application to ICSID to revise the arbitral award.  The parties are directed to notify

the Court, by joint letter to be submitted every 30 days from the date of this Opinion, as to the

status of proceedings before ICSID.

The Clerk of Court is directed to terminate the motion pending at docket number 12.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: February 13, 2015
New York, New York

50